## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

BIONCA MARTIN,

     Plaintiff,

v.

ILLINOIS DEPARTMENT OF HUMAN
SERVICES,

     Defendant.

Case No. 24 C 1785

Hon. LaShonda A. Hunt

## MEMORANDUM OPINION AND ORDER

Bionca Martin ("Martin") sued her former employer, Illinois Department of Human Services ("IDHS"), alleging race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. Following discovery, IDHS moved for summary judgment on Martin's claims. For the reasons discussed below, the motion (Dkt. 36) is granted.

## BACKGROUND[1]

Defendant IDHS is an agency of the State of Illinois with employees working in the Joliet Inpatient Treatment Center ("JITC"). (Dkt. 47 ¶ 1). JITC is a hospital operated by the Illinois Department of Corrections ("IDOC") that serves incarcerated patients with severe mental illnesses and is located within the grounds of the Joliet Treatment Center, a facility also operated by IDOC. (*Id.* ¶ 2).

---

[1] The relevant facts are taken from the parties' respective Local Rule 56.1 statements and are undisputed unless otherwise noted. For brevity, the Court refers to Plaintiff's Response to Defendant's Statement of Undisputed Material Facts as "Dkt. 47" and Defendant's Response to Plaintiff's Statement of Additional Facts as "Dkt. 51." Defendant objects to many of Plaintiff's "additional facts" as irrelevant or unsupported as required by Local Rule 56.1. The Court agrees for the most part. Thus, those facts are referenced in this ruling for context.

Plaintiff Martin (African American) is a licensed clinical social worker who was hired by IDHS in the role of Chief of Social Work for JITC, with a start date of February 1, 2023 and a six-month probationary period. (*Id.* ¶¶ 5, 7, 9). As Chief of Social Work, Martin's duties included overseeing the clinical program and services provided by social work staff she supervised in collaboration with a multidisciplinary team, coordinating social work services within JITC, reviewing documentation of lower level staff to ensure service delivery is clinically sound, effective continuity of care, and discharge planning. (*Id.* ¶ 8). Martin's immediate supervisor was Danielle O'Connell ("O'Connell"), Senior Public Service Administrator for Clinical Services at JITC. (*Id.* ¶ 16). In early 2023, O'Connell oversaw all mental health services in JITC and had approximately ten individuals under her direction. (*Id.* ¶ 17). In addition to Martin, O'Connell directly supervised one other employee, Angela Hewitt-Wright ("Hewitt-Wright"), the Director of Rehabilitation Services. (*Id.* ¶ 18). And Lisa Robinson ("Robinson"), the Hospital Administrator for JITC, directly supervised O'Connell. (*Id.* ¶ 19).

Martin was aware of the standards for disclosure and maintenance of patient information under the Health Insurance Portability and Accountability ("HIPAA"). (*Id.* ¶ 6). Prior to starting at IDHS, she signed the DHS Confidentiality Acknowledgment, agreeing that she would "not access or disclose customer or employee confidential information or protected health information," and would "maintain the confidentiality of any information learned during [her] employment at DHS." (*Id.* ¶ 10).

Martin further certified that she was issued a copy of the IDHS Employee Handbook ("Handbook"), and acknowledged that violation of those policies, rules, directives, or regulations could result in discipline, up to and including discharge. (*Id.* ¶ 11). However, she denies understanding that compliance with those policies and regulations was a condition of employment.

(*Id.* ¶ 11) The Handbook included an agreement to complete the Internet Access Certificate of Understanding along with the following policies:

> (1) DHS will provide Internet access on State owned equipment to employees with a legitimate business need for this access. All users are subject to applicable DHS policies and procedures. The DHS Computer Security Section monitors all Internet access, searches, sites visited, and downloads.

> (2) DHS computers are limited to State of Illinois business. . . . Employees are not to use DHS computers for personal business and may not copy DHS software for home or other personal use.

> (3) Employees with access to . . . individual protected health information (PHI), are subject to serious penalties for unauthorized use or disclosure of information.

(*Id.* ¶¶ 12-14).

The Handbook also provided that failure to comply with HIPAA may subject an employee to being charged with a variety of civil and criminal offenses and with penalties established under HIPAA, depending on the severity of the offense. Employees who knowingly violate HIPAA by wrongfully obtaining or disclosing confidential or PHI could be subject to a fine and/or imprisonment. The fines and/or imprisonment are more severe if the information was obtained or disclosed with the intent to sell, transfer or use the information for commercial advantage, personal gain or malicious harm. (*Id.* ¶ 15).

## I.      April 6, 2023 Dispute Between Martin and Hewitt-Wright

On April 6, 2023, Martin and Hewitt-Wright engaged in a verbal altercation using elevated voices that O'Connell overheard while walking out of the building with them. (*Id.* ¶¶ 20-21). O'Connell described Plaintiff's voice as "louder than normal volume" throughout the conversation, and believed that Hewitt-Wright did not match Plaintiff's volume. (*Id.* ¶ 22). Martin

3

disputes that description of her volume and points out that O'Connell ultimately found them both wrong for their actions that day. (*Id.*).

A meeting was scheduled on April 7, 2023 with Hewitt-Wright, O'Connell, and Martin, along with Juline Wondrasek ("Wondrasek"), JITC Director of Nursing, to discuss the April 6 incident. (*Id.* ¶ 23). However, before that meeting could begin, Martin asked Wondrasek to leave, and when Wondrasek would not, Martin stated that she "would no longer be attending" and left the meeting. (*Id.* ¶ 24).

On April 21, 2023, O'Connell informed Martin that a pre-disciplinary hearing was scheduled for April 24, 2023, regarding the April 6th dispute with Hewitt-Wright where Martin responded in an offensive and unsafe manner, Martin's action in exiting the April 7th meeting against the direct order of her supervisor, and concerns raised by JITC psychiatrists about Martin's interactions with patients, including Martin giving a patient the criminal history of another person in custody. (*Id.* ¶¶ 25-26; Dkt. 37-13). The April 24th meeting proceeded with O'Connell, Martin, and Teratineka Thomas ("Thomas"), Public Service Administrator for Human Resources at JITC; O'Connell says Martin was cautioned that "things need to change or she's going to be disciplined." (Dkt. 47 ¶ 27).

## II.    Martin's Performance Evaluations and Subsequent Discipline

Probationary employees were scheduled to receive performance evaluations at the 3-month and 6-month mark. (D. O'Connell Dep., Dkt. 37-3 at 26). Martin's first probationary performance evaluation covering the period of February 1, 2023, through April 30, 2023 was held with O'Connell on May 4, 2023. (Dkt. 47 ¶ 29; Dkt. 49-4). Martin contends that she received two

4

contrasting evaluations a day apart. (*Id.*)[2] Martin testified at her deposition that she was told the first version was just a draft. (Dkt. 37-1 at 129). O'Connell confirmed at her deposition that she emailed the "draft" evaluation form to Martin prior to the meeting and then read the "final" evaluation form when they met. (Dkt. 37-3 at 55-57).

In the "draft" probationary evaluation, O'Connell noted that Martin met or partially met most objectives and was unacceptable on teamwork, leadership, and human relations, but she garnered an overall "acceptable" rating. (Dkt. 49-3 at 1-6). However, at the meeting the next day, O'Connell presented Martin with a "final" probationary evaluation indicating that Martin had not met most objectives, was unacceptable on planning, initiative, knowledge, judgment, teamwork, leadership, and human relations, and had an overall "unacceptable" rating. (Dkt. 49-3 at 6-12).

Martin submitted written performance evaluation comments dated May 4, 2023 disputing O'Connell's assessment. (Dkt. 49-4, Ex. D). Martin subsequently refused to sign off on the "finalized" performance evaluation; however, O'Connell signed and submitted it on May 5, 2023. (Dkt. 37-17). Following her three-month evaluation, Martin was placed on a performance improvement plan under which O'Connell would evaluate Martin's progress on a weekly basis. (Dkt. 47 ¶¶ 35-36). O'Connell stated that she documented and sent findings to HR that Martin was not progressing as expected under the performance improvement plan. (*Id.* ¶ 37; Dkt. 37-3 at 29-30, 93).

---

[2] Martin references her own Exhibit C, which indicates the first "favorable" evaluation was emailed to her on May 2, 2023, and the second "unfavorable" was presented at a meeting on May 3, 2023. (Dkt. 49-3). However, according to her written performance evaluation comments, Martin was emailed the first evaluation on May 3, 2023, and was read the second evaluation on May 4, 2023. (Dkt. 49-4). The difference in dates is not dispositive, but the Court notes that the dates in Martin's comments align with her deposition testimony. (B. Martin Dep., Dkt. 37-1 at 129). For consistency, the Court will also treat May 3, 2023 and May 4, 2023 as the salient dates.

On June 2, 2023, Robinson and O'Connell met with Martin and orally reprimanded her for insubordination on April 7, 2023. (Dkt. 47 ¶ 28; Dkt. 37-14). Martin submitted a memorandum response to the charges and violations denying any wrongdoing and complaining of bullying by O'Connell. (Dkt. 49-5, Ex. E).

In Martin's final probationary performance evaluation dated July 5, 2023, for the period of May 1, 2023 through July 4, 2023, O'Connell found that she had not met most of her objectives and was unacceptable with respect to planning, quality, knowledge, judgment, teamwork, leadership, and human relations; thus, her overall rating remained "unacceptable." (Dkt. 47 ¶ 38). O'Connell noted that Martin "included a family member on an email correspondence that deal[t] with a work-related matter, "continues to disregard the chain of command that is in place and demonstrates no willingness to enhance her team relationships" and "should be further along in performing the duties of this role Independently given the amount of time she has been in this position." (*Id.* ¶¶ 40-42). Consequently, O'Connell recommended that Martin should not be certified in the position. (*Id.* ¶ 42; Dkt. 37-17).

On July 5, 2023, a pre-disciplinary hearing was held on Martin's suspension pending discharge based on three charges: 1. violation of Administrative Directive 01.02.03.040 Rules of Employee Conduct for Insubordination; 2. violation of the IDHS Employee Handbook on Electronic Mail for misuse on April 27, 2023, May 8, 2023, May 12, 2023, and June 6, 2023; and 3. Unsatisfactory work performance, including for breach of confidentiality. (Dkt. 47 ¶ 43; Dkt. 37-18). O'Connell recommended this action based on Martin's violations of the electronic mail policy on April 27, 2023, May 8, 2023, May 12, 2023, and June 6, 2023 and her assessment that Martin failed to meet the weekly requirements set forth in her corrective action plan. (Dkt. 47 ¶ 44; Dkt. 37-18). O'Connell believed Martin's conduct was in violation of the IDHS Employee

Handbook section IV on Employee Conduct, in violation of IDHS Administrative Directive 01.02.03.040 Rules of Employee Conduct, and the State of Illinois Code of Personal Conduct. Id. (*Id.*).

Martin's use of State email for personal reasons was investigated because O'Connell "came to [Robinson] with a very disturbing e-mail from [Martin's] husband regarding work matters," which contained an emoji that O'Connell said made her feel "threatened." (Dkt. 47 ¶ 45). Martin admitted to using her work email for personal use on those dates. (*Id.* ¶ 46). Specifically, on April 27, Martin emailed her husband from her state-issued email account about the light being on in her office, and he replied saying: "When you leave be sure to leave a note asking to 'turn the light off once your [sic] are done, Thank you!' LOL". (*Id.* ¶ 47). On May 8, Martin forwarded the April 27 email from her husband to her state-issued email account to her personal email account registered for her secondary employment. (*Id.* ¶ 48). On May 12, Martin emailed her husband from her state-issued email account asking him: "Art for the house?" followed by a link to an external third-party website. (*Id.* ¶ 49). On June 6, Martin sent her husband a work email from O'Connell regarding use of benefit time, and asked him to "translate please." (*Id.* ¶ 50). On June 6, he responded stating, *inter alia*, "You got a live one there…. SMH". (*Id.* ¶ 51). Martin replied to him the same day stating: "I cc'd you on my response. I don't know what you sent but you sent it to me AND my supervisor." (*Id.* ¶ 52).

In addition, Robinson indicated that two JITC psychiatrists had reported Martin's behavior in the workplace to Robinson. (*Id.* ¶ 53). Robinson received an email from Dr. Larry Gaines on April 12, 2023, stating that he was concerned Martin had "looked up this information and told the patient the conviction charges of this individual." (*Id.* ¶ 54). That same day, Robinson also received

an email from Dr. Lolita Ang stating that Martin had "volunteered that she gave the information about the patient's boyfriend's conviction to her following her request for it." (*Id.* ¶ 55).

Martin was suspended pending discharge on July 5, 2023, and discharged effective July 15, 2023. (*Id.* ¶ 56).

### III.    Martin's Discrimination Complaint

On May 4, 2023, Martin filed an internal complaint of age, race, color, and disability discrimination since at least March 29, 2023, naming O'Connell. (Dkt. 51 ¶ 7, Ex. G). Prior to her discharge, Martin had no disciplinary action taken against her other than the oral reprimand in June 2023. (*Id.* ¶ 1). O'Connell did have ongoing conversations with Martin about performance issues, some of which were in writing. (*Id.* ¶ 2). O'Connell says that she was unaware of Martin's specific complaints against her and that HR did not bring them to her attention. (*Id.* ¶ 3). Martin disputes her statement, asserting that O'Connell knew as early as the first probationary evaluation on May 4, 2023, but O'Connell never reported Martin's comments to HR. (*Id.* ¶¶ 3-4). Even after complained of "bullying" in her June 2023 pre-disciplinary hearing memorandum, O'Connell said she did not recall HR raising any of those concerns with her. (*Id.* ¶¶ 6, 8). Martin did challenge O'Connell about the dress code and says O'Connell harassed her for wearing dresses and skirts. (*Id.* ¶ 9; Dkt. 49-6).

Martin brought this two-count complaint against IDHS alleging race discrimination/hostile work environment (Count I) and retaliation (Count II). IDHS's summary judgment motion is fully briefed.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is

"genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" and "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial," *id.* at 324, and support their position with "more than a scintilla of evidence[,]" *Conley v. Vill. of Bedford Park*, 215 F.3d 703, 709 (7th Cir. 2000). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In considering a motion for summary judgment, all "justifiable" inferences are drawn in favor of the non-moving party. *Anderson*, 477 U.S. at 255; *see also Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022) (non-moving party receives "benefit of conflicting evidence" as well as "any favorable inferences that might be reasonably drawn from the evidence"). Additionally, a court must refrain from weighing evidence or making credibility determinations. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citation omitted).

## DISCUSSION

### I.      Race Discrimination

Martin contends that IDHS disciplined and terminated her because she is African American. Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). In Title VII cases, "an unlawful employment practice is established when the [plaintiff] demonstrates that race . . .

9

was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* § 2000e-2(m). A plaintiff may prove race discrimination using the traditional burden-shifting test articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or the holistic approach set forth by the Seventh Circuit in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). Because the parties reference both standards, the Court considers her claim under each framework.

### A.   *McDonnell Douglas*

The *McDonnell Douglas* test requires a plaintiff to establish a *prima facie* case of discrimination by showing that "(1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from his employer." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021). If a plaintiff is successful in doing so, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas*, 411 U.S. at 802. If the employer can articulate such a reason, the burden then shifts back to the plaintiff to demonstrate that the employer's proffered reason is pretextual. *Igasaki*, 988 F.3d at 957 (quoting *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020)).

Martin's race discrimination claim fails at the outset because she cannot satisfy her *prima facie* burden. She belongs to a protected class (African American) and suffered an adverse action (termination), leaving only the second and fourth elements at issue. While the parties debate at length about whether her job performance was satisfactory, the Court need not resolve that issue since Martin has not met the similarly situated prong of the test.

To survive summary judgment, Martin must show that IDHS treated her differently than someone outside her protected class who is "directly comparable in all material respects." *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006). In other words, details about the proposed comparators matter. As IDHS correctly points out, Martin has not shown that a similarly situated employee outside of her protected class was treated more favorably. (Def. Memo. at 8, Dkt. 38). In fact, nowhere in Martin's Local Rule 56.1 statement or response brief does she actually identify the race of anyone other than herself. At best, she vaguely asserts that Hewitt-Wright is a proper comparator since she was supervised by O'Connell and not formally disciplined after their verbal altercation (Plt. Memo. at 5, Dkt. 50). But with no factual support for her assertions about Hewitt-Wright, all Martin relies upon is speculation, which is not enough at this stage of the case. For summary judgment is the time for a litigant to "put up or shut up" by "show[ing] what evidence it has that would convince a trier of fact to accept its version of events." *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021) (internal quotation marks omitted).

Indeed, Martin does not identify Hewitt-Wright's race let alone explain if she was in a probationary status or had any prior disciplinary history. Martin cites *Coleman v. Donahue*, which explains that "[c]omparators must have 'engaged in similar—not identical—conduct to qualify as similarly situated.'" 667 F.3d 835, 850 (7th Cir. 2012). Yet Martin fails to present evidence that she and Hewitt-Wright are in fact similar. It is undisputed that Martin was a probationary employee orally reprimanded for insubordination because she left a meeting in defiance of an order from their supervisor, not because she and Hewitt-Wright had argued. Furthermore, IDHS ultimately terminated Martin for not only that incident of insubordination but also violations of the confidentiality policy *and* the email policy *and* continued job performance issues.

11

But the record here is silent on key details about Hewitt-Wright's situation. In sum, Martin has not provided information to assist the Court with determining if they are truly comparable. *See McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019) (rejecting argument that "eight other [employees with the same job title] under [his boss's] supervision qualify as similarly situated employees" where plaintiff did "not provide any information that would allow a finder of fact to determine that these individuals [were] indeed similarly situated" as he "did not submit the employees' names, work history, performance reviews"). Martin's failure to prove her *prima facie* case dooms her race discrimination claim. *See McDaniel*, 940 F.3d at 368 ("Since [plaintiff] did not put forth sufficient information about similarly situated employees outside of his class that were treated more favorably, his discrimination claim fails under the *McDonnell Douglas* framework.").

### B. *Ortiz* Test

As an alternative to *McDonnell Douglas*, the Court considers *Ortiz*, which instructs that "all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz*, 834 F.3d at 766. The standard "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . *caused* the discharge or other adverse employment action." *Id.* (emphasis added). The Seventh Circuit has identified "ambiguous or suggestive comments or conduct[,]" "better treatment of people similarly situated but for the protected characteristic[,]" and "dishonest employer justifications for disparate treatment" as "three broad types of circumstantial evidence that will support an inference of intentional discrimination." *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020). Even after drawing all reasonable inferences in Martin's favor, the Court concludes that the evidence "as a whole" in this record does not come close to suggesting that her race played any role in how she was treated by IDHS.

12

Lacking direct evidence of discrimination, Martin must rely on the "broad" categories of circumstantial evidence identified by *Joll*. Here, there are no "ambiguous or suggestive" comments which would support a finding of discriminatory animus. As the Court already noted, Martin does not state the race of anyone other than herself, nor does she assert that racial or other derogatory terms were used towards her. Furthermore, as discussed *supra*, Martin has not shown that IDHS treated similarly situated non-African American employees better.

Finally, Martin challenges IDHS's justification for her termination as dishonest because of shifting explanations about her initial probationary evaluation. While the Court agrees that the record is fuzzy on the exact factors that prompted O'Connell to change Martin's initial 3-month probationary overall rating from acceptable to unacceptable, Martin has not pointed to suspicious circumstances to suggest that the true reason for the pivot was her race. On that point, Martin's reliance on *Hitchcock v. Angel Corps, Inc.* is misplaced. 718 F.3d 733 (7th Cir. 2013). There, the court explained that "a showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext for the prohibited animus." *Hitchcock*, 718 F.3d at 740. Issues of fact existed because the employer made offensive remarks about the plaintiff's pregnancy and then offered inconsistent reasons for her firing a short time later. *Id.* at 741. In contrast, Martin makes no connection here between her race and any of IDHS's employment decisions.

To the contrary, the record bears out that O'Connell understandably had concerns about a new Chief of Social Work who in the first two months of her probationary period engaged in an altercation with a co-worker, had psychiatrists questioning her supervisory performance at a facility for mentally ill incarcerated offenders, and openly defied her supervisor, just to name of the complaints. Martin's mere belief that racial animosity caused her termination, without more, simply cannot stave off summary judgment. *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th

13

Cir. 2024) ("Speculation cannot create a genuine issue of fact that defeats summary judgment.");

s*ee also Dale v. Chi. Trib. Co.*, 797 F.2d 458, 465 (7th Cir. 1986) (affirming summary judgment

and holding that "[plaintiff] must do more than challenge the judgment of his superiors through

his own self-interested assertions.").

The Court is not tasked with determining if IDHS's actions were correct. The pretext

inquiry is limited to assessing if an employer was motivated by illegitimate animus. In the end,

"[t]his Court does not sit as a super-personnel department that reexamines an entity's business

decisions." *Dale*, 797 F.2d at 464. Because the record does not reflect any evidence of illegal bias

underlying these employment decisions, Martin's discrimination claims would also fail under

*Ortiz*.

Accordingly, IDHS is entitled to summary judgment on the race discrimination claim.[3]

## II.     <u>Retaliation</u>

Martin's claim that she was retaliated against for complaining about O'Connell and others

at IDHS fares no better than her claim of racial discrimination. A plaintiff may prove retaliation

under either a direct or indirect method of proof. Under the direct method, a plaintiff must present

evidence of "(1) a statutorily protected activity; (2) a materially adverse action taken by the

employer; and (3) a causal connection between the two." *Volling v. Kurtz Paramedic Servs., Inc.*,

---

[3] IDHS also moved for summary judgment to the extent Martin claims a racially hostile work environment. (Def. Memo. at 11-12). In her response brief, Martin pretty much ignores this argument. At most, she makes conclusory assertions about receiving "heightened scrutiny, tone policing, and accusations of being 'defensive' or 'challenging'" and indicates that "her internal discrimination complaint details these occurrences and identifies specific personnel engaged in discriminatory conduct." (Plt. Memo. at 4). However, that complaint (her Ex. G) is barebones and references "documentation in an attachment" that she did not include in the record. (*See* Dkt. 49-7). In other words, Martin offers no real defense. The Court thus concurs with IDHS that she has waived this point. *See Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived."). Even if that were not the case, Martin's claim would still fail because the described conduct is not "sufficiently severe or pervasive [enough] to alter the conditions of employment such that it creates an abusive working environment." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840-841 (7th Cir. 2009).

840 F.3d 378, 383 (7th Cir. 2016) (citing *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010) (citation omitted)). Under the indirect method, "the first two elements remain the same, but instead of proving a direct causal link, the plaintiff must show that he was performing his job satisfactorily and that he was treated less favorably than a similarly situated employee who did not complain of discrimination." *Stephens v. Erickson*, 569 F.3d 779, 786-787 (7th Cir. 2009). Similar to the *McDonnell Douglas* analysis, if a plaintiff can establish a prima facie case of retaliation under the indirect method, the burden shifts to the defendant to provide a nondiscriminatory justification for its action and, if the defendant meets that burden, it falls on the plaintiff to establish that the defendant's justification is pretextual. *Id.* at 787.

The Court can quickly dispose of Martin's retaliation claim under both methods for the same reasons discussed *supra* with regard to her race discrimination claims. In short, she cannot prevail under the indirect method without identifying a similarly situated employee who was treated more favorably after engaging in protected activity. On this point, she does not identify a single employee—regardless of race—who complained to IDHS about harassment or discrimination.

And proceeding under the direct method is a nonstarter because Martin cannot show causation between her complaints and termination. Construing the facts in her favor, Martin certainly engaged in protected activity in May 2023 when she challenged the first probationary evaluation and filed an internal complaint of discrimination. She relies on the short timeframe—two months—between her complaint and the oral reprimand, performance improvement plan, and her discharge at the end of her 6-month probationary period. Nevertheless, Martin lacks evidence of but-for causation such as admissions of retaliatory animus by the decisionmakers or sufficient

15

circumstantial evidence to raise a triable issue of fact. On this thin record, no reasonable jury could rule in her favor.[4]

Accordingly, IDHS is entitled to summary judgment on her retaliation claim.

## CONCLUSION

For all the foregoing reasons, summary judgment is entered in favor of Defendant IDHS on all claims in the complaint.

DATED: March 26, 2026          ENTERED:

LASHONDA A. HUNT
United States District Judge

---

[4] Martin argues that IDHS's "failure to investigate [her] discrimination complaint" is a procedural irregularity that demonstrates pretext. (Plt. Memo. at 6). Citing *Perez v. Thorntons, Inc.*, 731 F.3d 699, 710 (7th Cir. 2013), she contends that this "deviation from normal procedures [is] probative of retaliation." *Perez* does not stand for that premise. More importantly, Martin has not developed a factual basis for this conclusion. O'Connell said she did not recall being asked by HR about Martin's complaint. But that does not mean IDHS never initiated an investigation. Because Martin did not include any details about the subject of her complaint let alone testimony from anyone at IDHS about its typical investigatory process for discrimination complaints or steps taken in connection her specific complaint, the Court cannot presume that any such deviation from regular procedures occurred. Again, Martin cannot rely on speculative theories to avoid summary judgment.